

## GENERAL TERMS AND CONDITIONS
## FOR MARINE BUNKER SALES 2017
## (Revision 1.2 2019 amendments)

COMPAÑIA ESPAÑOLA DE PETROLEOS, S.A.U. (CEPSA)
GENERAL TERMS AND CONDITIONS FOR MARINE
BUNKER SALES 2017 1.2 (as amended in 2019)

# CONTENT

1. APPLICABILITY AND SCOPE: ................................................................. 1
2. DEFINITIONS: ......................................................................................... 1
3. OFFERS, QUOTATIONS AND PRICES: ................................................. 4
4. SUPPLY: ................................................................................................... 6
5. MEASUREMENT AND SAMPLING: ...................................................... 10
6. AGENTS: ................................................................................................... 12
7. THIRD PARTY PORTS: ........................................................................... 12
8. TITLE AND RISK: .................................................................................... 12
9. QUANTITY AND QUALITY CLAIMS: ................................................... 13
10. UTILISATION OF BUNKERS: ................................................................. 14
11. ORIGIN: .................................................................................................... 14
12. PRICE AND PAYMENT: ........................................................................... 14
13. TAXES AND ASSESSMENTS: .................................................................. 15
14. CHARGES: ................................................................................................ 16
15. LIEN: ......................................................................................................... 16
16. LIABILITY AND INDEMNITY: ............................................................... 17
17. FORCE MAJEURE AND OTHER EXCEPTIONS: ................................... 18
18. SUSPENSION, BREACH AND TERMINATION: ..................................... 19
19. RESTRICTIONS: ....................................................................................... 20
20. PROHIBITED COUNTRIES: ..................................................................... 20
21. HEALTH AND THE ENVIRONMENT: ..................................................... 20
22. NEW AND CHANGED REGULATIONS: .................................................. 21
23. ANTI-CORRUPTION AND SANCTIONS: ................................................ 22
24. RECORDING, RETENTION AND MONITORING OF COMMUNICATIONS: . 23
25. APPLICABLE LAW AND DISPUTE RESOLUTION: ............................... 23
26. MISCELLANEOUS: ................................................................................... 23
    26.1. Amendments and variations: ............................................................ 23
    26.2. Notices: ............................................................................................. 23
    26.3. No waiver: ......................................................................................... 24
    26.4. Waiver of immunities: ...................................................................... 24
    26.5. Incorporation: ................................................................................... 24
    26.6. Entire agreement: ............................................................................. 24
    26.7. Severability: ..................................................................................... 25
    26.8. Partial Validity: ................................................................................ 25
    26.9. Rights of third parties: ..................................................................... 25
    26.10. Reach compliance: .......................................................................... 25
    26.11. Assignment and succession: ............................................................ 25
    26.12. Substitution: .................................................................................... 26
    26.13. Confidentiality: ............................................................................... 26
    26.14. No partnership: ................................................................................ 27
    26.15. Data and data protection: ................................................................ 27
    26.16. Compliance with law: ...................................................................... 28

# COMPAÑIA ESPAÑOLA DE PETROLEOS, S.A.U. (CEPSA) GENERAL TERMS AND CONDITIONS FOR MARINE BUNKER SALES 2017 1.2 (AS AMMENDED IN 2019) EDITION

## 1. APPLICABILITY AND SCOPE:

These General Terms are effective from 1st January 2017[1] and constitute integral part and govern the Marine Bunker Sale Contracts that are entered into between "CEPSA" (hereinafter "the Seller") and "the Buyer" with regard to everything related to requests, quotations, offers, nomination, delivery, services, price and payment of the Marine Fuel sold and all subsequent contracts of whatever nature. In the event of any discrepancy between these General Terms and Conditions and the Specific Terms agreed by the parties, in each case, the latter shall prevail.

Unless otherwise agreed in writing between the Seller and the Buyer, these General Terms and Conditions, as amended from time to time, supersede any earlier terms and conditions and shall override any terms and conditions stipulated, incorporated or referred to by the Buyer whether in its order, stamping of documentation or elsewhere save in the Specific Terms.

No statements made outside the Contract in any manner whatsoever, such us but not limited to brochures, catalogues, commercial literature and correspondence, as well as any correspondence by any means (whether electronic or in paper) or oral communications are intended to and will not have contractual effect except if expressly mentioned in this General Terms or in the Contract. Any offer, counter-offer or amendment proposed by the Buyer shall not be deem impliedly accepted by the Buyer and incorporated to the Contract except if expressly accepted in writing by the same Buyer.

### Third Party Ports
The parties acknowledge that at certain Delivery Ports the Delivering Company may be a third party which is not a Cepsa Affiliate. The Seller shall notify the Buyer of such fact at the time of nomination. Where delivery at such Delivery Ports is requested by the Buyer, the terms and conditions on which Marine Fuels are supplied may be different from these terms and conditions, such differences must be agreed in writing by the Buyer and failing agreement the Seller will supply on these terms and conditions. A copy of any such terms and conditions will be provided to the Buyer by the Seller at the Buyer's request. In case of inconsistencies between the terms of a third party and these General Terms the third party terms shall prevail. The Special Terms of the Contract shall prevail always over any applicable General Terms.

## 2. DEFINITIONS:

Unless the context otherwise demands:

- **"_Agent_"** means any company other than a Seller's subsidiary or the Buyer that acts on behalf of the Seller or the Buyer whether by contract or *de facto* with regard to the actual delivery of the Marine Fuels or ordering the Marine Fuels on behalf of the Buyer. All and any bunker sales made by the Seller are made relying in the implied or express representation and warranty of a Buyer's

---

[1] 2019 amendments are effective since 1st February 2019

1

Agent that is acting with full and unlimited authority of the Buyer for directly binding the Buyer and the Vessel.

- **_"Banking Day"_** means a day, (other than a Saturday or a Sunday) on which banks are open in the places of business of the Sellers and the Buyers and, where a remittance is in US dollars, in New York or, if a remittance is in a currency other than US dollars, in the principle financial centr of the country of that currency.

- **_"BDN"_** means Bunker Delivery Note.

- **_"Bunker Tanker"_** means bunker barge or tanker or tank truck supplying Marine Fuels to the Vessel.

- **_"Buyer"_** means the party requesting the Seller either to sell and deliver to it, or to arrange for the sale and delivery to it of Marine Fuels. If the Buyer is acting as trader, broker, agent, manager, purchasing office or in any other similar capacity, the Buyer represents and warrants to the Seller and its Agents that it has received full authority to appoint the Seller as physical or final supplier for the Vessel under the final authority of her owners and/or disponent owners.

- **_"Cepsa Affiliate"_** means (i) Compañía Española de Petróleos, S.A.U. (Cepsa) and (ii) any company (other than the Seller) which is from time to time directly or indirectly controlled by Cepsa or acting as its agent by contract or _de facto_. For this purpose:

  - a company is directly controlled by another company or companies if that latter company beneficially owns or those latter companies together beneficially own fifty per cent or more of the voting rights attached to the issued share capital of the first mentioned company;

  - a company is indirectly controlled by another company or companies if a series of companies can be specified, beginning with that latter company or companies and ending with the first mentioned company, so related that each company of the series (except the latter company or companies) is directly controlled by one or more of the companies earlier in the series.

- **_"Confirmed Nomination"_** shall have the meaning defined in clause 4.4 below.

- **_"Commitment"_** means a Bunkering Commitment or any other commitment governed by these terms and conditions. For the avoidance of doubt, each of a Floating Price Term Deal and a Fixed Price Basis Deal is a Commitment.

- **_"Contract"_** means collectively the Specific Terms and these General Terms and Conditions that altogether shall be deemed to constitute a Marine Fuels Sale and Purchase contract.

- **_"Day"_** means a calendar day, unless stated otherwise.

- **_"Delivering Company"_** means the party having Marine Fuels available for sale at a port and requested by the Seller to deliver to the Buyer. Where the Seller itself has Marine Fuels available for sale at the specified port it shall act both in its role as a party to these General Terms and Conditions and as a Delivering Company as that role is described herein.

- **_"Delivery Port"_** means the port or place at which Marine Fuels are delivered under a Commitment.

- **_"Delivery Window"_** means the date range designated in the Contract (as applicable), which shall begin on the ETA and end on the ETD. The Delivery Window shall not exceed four (4) days.

- **_"Equipment"_** means the Buyer's equipment at the Delivery Port.

- **_"ETA"_** means the estimated date of arrival of the Buyer's vessel requiring the delivery of Marine Fuels.

- **_"ETD"_** means the estimated date of departure of the Buyer's vessel requiring the delivery of Marine Fuels.

- **_"EURIBOR"_** means the euro interbank offered rate administered by the European Money Markets Institute (or any other person which takes over the administration of that rate) for the relevant period displayed on page EURIBOR01 of the Reuters screen (or any replacement Reuters page which displays that rate, or on the appropriate page of such other information

service which publishes that rate from time to time in place of Reuters) and, if any such rate is below zero, EURIBOR will be deemed to be zero.

- "*Government Official*" means a government official or an officer or employee of a government or any department, agency or instrumentality of any government including any public sector company or an enterprise in which a government owns a majority or controlling interest or an officer or employee of a public international organisation or any person acting in an official capacity for or on behalf of any government or department, agency, or instrumentality of such government or of any public international organisation or any political party or official thereof, or any candidate for political office or any other person, individual or entity at the suggestion, request or direction or for the benefit of the aforementioned persons or entities.
- "*LIBOR*" means the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) for the relevant currency and period displayed on pages LIBOR01 or LIBOR02 of the Reuters screen (or any replacement Reuters page which displays that rate, or on the appropriate page of such other information service which publishes that rate from time to time in place of Reuters) and, if any such rate is below zero, LIBOR will be deemed to be zero.
- "*Maximum/Minimum Price Basis*" or any other similar price basis as set out in a Sales Order.
- "*Marine Fuels*" means any of marine fuel oil, marine diesel fuel, marine gas oil, LNG and any other that may be included/excluded from time to time in the Seller's Website: https://bunker.cepsa.com. The Marine Fuels supplied to the Vessel shall be considered as provided necessaries whether supplied directly or as subcontractor.
- "*Owner/Disponent Owner/ Vessel's Owner*" means the company or person owning the Vessel or having the final full legal and contractual authority and capacity to buy the Marine Fuels under the Contract and to bind the Vessel *in rem*, whether directly or through an Agent.
- "*Party*" means Sellers or Buyers.
- "*Pre-delivery Check List*" means the check list prepared by the Seller and signed by or on behalf of the Seller and the Buyer to confirm agreement on the conditions and procedures under which physical delivery of the Marine Fuels shall take place.
- "*Port Services Guide*" means the Port Services Guide as amended, varied or supplemented from time to time, the current version of which can be found on https://bunker.cepsa.com
- "*Prohibited Country*" means (i) any country which at the time of disposal is declared or is declared an embargoed destination by the government(s) of the United States of America, the European Union or the country in which the Marine Fuels are produced or from which the Marine Fuels are exported; or (ii) which is a destination prohibited by the terms on which Seller has acquired the Marine Fuels; and shall at all times include any other countries as may be advised from time to time by the Seller in its discretion.
- "*Seller*" means the Cepsa Affiliate entering into the Sales Contract with the Buyer.
- "*Spot Sale*" means a one-off transaction for a defined volume of Marine Fuels to be delivered at an agreed location on an agreed date for an agreed price.
- "*Vessel*" means the vessel nominated by the Buyers to receive Marine Fuels. For the purposes of this General Terms and Conditions the word "Vessel" includes non-vessels from a legal point of view such as marine platforms, hovercrafts, and any other propelled or not floating objects as well as leisure and fishing boats and yachts.
- "*Working days*" means the working days according to the official calendar of the relevant Seller's premises in Spain.
- "*Working hours*" means the working hours in the Seller's premises in Madrid, i.e. from 09:00 to 18:00 each working day (Spain's official time).

## 3. OFFERS. QUOTATIONS AND PRICES:

### 3.1. Request for Supply:

*3.1.1.* The Buyer will provide the Seller written notice of the Request for Supply, that must contain at least the detailed description of the type of Marine Fuel that will be supplied by the Seller to the Vessel nominated by the Buyer, as well as an approximate indication of the volume of Marine Fuel (in Metric Tons or Cubic Metres) to be supplied and of the location(s) and date(s) on which the supply is to be received.

*3.1.2.* The Buyer has the absolute, exclusive responsibility for the choice and description of the Marine Fuel to be supplied, which must be suitable for the Vessel. The Buyer shall also be solely, absolutely and exclusively liable as to the compatibility between the Marine Fuel stated and the fuels that are on board the Vessel prior to the supply.

*3.1.3.* The quality of the Marine Fuel supplied by the Seller shall match the quality guaranteed at the moment and location or port of supply for such Marine Fuel according to Section 9.

*3.1.4.* Except if otherwise specifically agreed in the Contract, the quality of the Maine Fuels shall be determined in accordance to ISO 8217, latest version, or otherwise as determined in the Sale Offer (*see 3.4 below*).

### 3.2. Sale Offer:

The Seller will draw up a Sale Offer, which shall establish the terms of the Delivery Port or other location (only if admitted by the applicable Law) and the Delivery Window on which it is willing to provide the supply requested. In the Sale Offer, the Seller will also state the price (or formula to determine it) and the terms of payment of the supply, as well as, when appropriate, the maximum amount of Marine Fuels it is willing to supply, and the means it has available to provide the supply at the port or location requested.

### 3.3. Completion of the Sale:

The Sale Offer shall be binding on the Seller during twenty (20) minutes from the hour and minute in which the Sale Offer is sent, except if otherwise stated therein, and shall expire if a **Final Supply Order** (*see 3.4 below*) in writing from the Buyer has not been received by the Seller within the said twenty (20) minutes. If the Buyer is still interested in buying the Marine Fuels from the Seller, a new updated Sale Offer must be requested and the whole process will restart. The Seller can, at its sole discretion extend the validity period of any Sale Offer.

In the Final Supply Order, the Buyer, in addition to unconditionally confirming its decision to acquire the Marine Fuels at the price and under the conditions set forth in the Sale Offer, shall provide to the Seller the following information in writing:

- The name, personal or corporate T.I.N. (Tax Identity Number: VAT Number or equivalent) or equivalent complete tax identification number under the laws of the Buyer; address and place of registry inscription of the Buyer; in the case of Vessels registered under a non-Spanish flag, the name and T.I.N. of the Agent;
- The name, IMO number and flag of the Vessel;
- The name, personal or corporate T.I.N. or equivalent complete tax identification number under the laws of the Buyer; address and place of registry inscription of the Vessel Owner and Disponent Owner Companies;
- The location or port of supply of the Marine Fuel;

- The date and estimated or approximate time of arrival (ETA) of the Vessel at that location or port;
- The description and quantity of the Marine Fuel to be supplied;
- Specific and unconditional acceptance of the price (or the means of determining it), and of the terms of payment established in the Sale Offer, as well as the means of supply and specific acceptance of its respective cost;
- The estimated date of supply of the Marine Fuel;
- The name and address of the person or company that is expressly assigned as the Agent of the Vessel to be supplied at the location or port of supply.
- All the information that may be necessary or useful for adequate performance of the supply operation.
- Its and the Owner/Disponent Owner (as applicable) knowledge and unconditional acceptance of these General Terms and the specific ones that may have been agreed for the relevant supply.

### 3.4. **Final Supply Order:**

*3.4.1.* The Buyer shall fill-in the information requested by the Seller in its Sale Offer and will send its Final Supply Order in writing to the Seller. The Final Supply Order can be issued by the Buyer either:

      i) Sending to the Seller its own form of Final Supply Order or confirmation e-mail; or
      ii)Duly signing and stamping and sending to the Seller the Confirmed Nomination (that is the document sent by the Seller to the Buyer confirming all the binding terms and conditions of the Commitment), in both cases by e-mail sent exclusively to the e-mail address bunker@cepsa.com.

*3.4.2.* The Final Supply Order (or signed Confirmed Nomination, as applicable), that implies specific acceptance without alteration of any of the terms set forth in the Sale Offer by the Seller, shall only be valid, acceptable and binding upon the latter if, in addition to providing the information requested in the Final Supply Order, such information is received by the Seller within the term of validity of the Sale Offer and in any case during the Working Hours of the same Working Day in which the Sale Offer was sent by the Seller.

*3.4.3.* Should the Buyer wish to request a variation of the terms of the Final Supply Order (or the Confirmed Nomination, as applicable) as to the final quantities of Marine Fuels to be supplied, the Delivery Port or location and/or Delivery Window for the supply and/or the price (or formula to determine this) and/or the terms of payment of that supply:
(i) It must expressly inform the Seller in writing (as specified in subclause 3.3 above) from the Seller.
(ii) The Seller shall not be bound by the new terms proposed by the Buyer until and if they are expressly accepted in writing in a new Confirmed Nomination of the Seller.
(iii) If such specific acceptance is not given, or if the Seller specifically rejects the new terms proposed by the Buyer, the Final Supply Order and/or the Confirmed Nomination (as applicable shall be deemed completely null and void and the Seller shall not be obliged to provide any supply of Marine Fuels to the Buyer, unless the latter reconsiders its position and specifically and unconditionally accepts the terms of the original Supply Order from the Seller.

*3.4.4.* The issuance by the Buyer of the Final Supply Order, or the issuance by the Seller of a new Supply Offer or Confirmed Nomination accepting the new terms of supply proposed by the Buyer shall complete the Commitment between both parties. If the Buyer does not take actual delivery of the Marine Fuels within the agreed Delivery Window, the Commitment to supply shall be considered definitely cancelled, null and void and without any effect whatsoever, notwithstanding the parties being able to enter into a new Contract amending the original terms,

and without prejudice to all and any Seller's rights and remedies against the Buyer and its Agents for breach of contract, except if specifically waived in writing, if and when entering into a new contract. Such rights shall not be deemed waived in any case by a new Commitment between the Seller and the Buyer, except if specifically agreed in writing.

*3.4.5.* In case of an unilateral cancellation of the Commitment, whether in whole or in part, made by the Buyer, the Seller shall in any case be entitled to charge a fixed lumpsum for costs incurred (as stated in the Sale Offer or Final Supply Order) as well as to claim damages in case of unilateral total or partial cancellation of the Commitment by the Buyer and if no cancellation is noticed and the Vessel does not arrive to the agreed Delivery Port or location, the Seller will be entitled to double damages. To this effect, "damages" means all and any operational, logistics and financial (including but not limited to risk management and hedging) damages, prejudices and losses suffered by the Seller and directly caused by the Buyer's cancellation. The Seller informs the Buyer that, as an usual business practice, it does normally incur in foreseeable financial expenses and costs to cover the risks caused by any Commitment.

*3.4.6.* All notices regarding this article 3 shall be made in writing via e-mail and will only be deemed received by the other party when receipt has been acknowledged by the same means.

*3.4.7.* In case of discrepancies between the different documents referred to along this section 3, the Confirmed Nomination shall prevail. Any terms and conditions proposed by the Buyer in its Request for Supply, Final Supply Order or elsewhere that are not expressly accepted by the Seller shall have no effect and will not bind the Seller. Any terms and conditions proposed by the Seller in its Sale Offer or Confirmed Nomination shall be binding upon both parties if not expressly objected or refused in writing by the Buyer. If objected or refused, the sale shall not be deemed completed.

## 4. <u>SUPPLY</u>:

### 4.1. <u>Prior Notice of Supply:</u>

*4.1.1.* The Buyer and the Vessel's Agent shall notify her estimated time of arrival (ETA) to the Seller and to its local representative at the Delivery Port or location 48, 24 and 12 working hours prior to arrival of the Vessel and shall also notify the Seller and its local representative about any change in the said ETA of the Vessel exceeding three (3) hours (one (1) hour in the case of supplies by tanker truck), and will report the exact actual position of the Vessel and time at which the supply is required. The Seller may refuse to Supply if any of such notices is not timely made by the Buyer and the Vessel's Agent. If the Supply is delayed due to Buyer's misinformation about the Vessel's ETA, the Seller may charge to the Buyer a lumpsum per hour of delay plus any additional costs and damages as the Seller may suffer.

*4.1.2.* The prior notice will include the following information:
- The estimated place of mooring / anchoring of the Vessel to be supplied.
- Written notification to the Seller – at least 48 hours prior to the date of supply – of all the special conditions, difficulties, peculiarities, deficiencies or defects concerning the Vessel, or that are specific to the Vessel and might adversely affect the supply of the Marine Fuel.
- All information that might be necessary or useful for the smooth running of the supply operation.
- Any other information that the Buyer may reasonably request in writing in order to safely perform the supply operations to the Vessel.

*4.1.3.* All additional costs, damages and expenses that arise from a change in the supply conditions shall be borne by the Buyer. However, the Seller can reject to effect the Supply if the

prior notice makes it clear that there could be, at the Seller's discretion, safety problems or extra-costs not paid or guaranteed in advance by the Buyer.

### 4.2. Confirmation of supply and invitation to witness measurements:

Prior to the delivery, the Master, First Officer or Chief Engineer (as may be applicable, but always implied that they have full authority binding upon the Vessel's Owner and Disponent Owner) of the Vessel to be supplied will confirm the quantity and description of the Marine Fuel, signing and stamping with the Vessel Owner's seal (or seal of the Vessel) the document called *"Confirmation of Supply and Invitation to Witness Measurements"*, that will be delivered to him by the Seller.

The Vessel's Master shall also declare in writing in that document, whether or not he intends to be present, or represented, at the moment of measuring the quantity supplied and the sample taking.

The actual supply will only commence if the said document is delivered to the Seller signed and sealed as aforementioned.

### 4.3. Supply:

The supply of Marine Fuel will take place according to the Final Supply Offer previously made by the Seller. The Marine Fuel shall be supplied to the Vessel at the location or port of supply. The supply shall be performed according to the laws in force and applicable at the moment and in the location or port of supply and, especially, according to the regulations of the port or location of supply.

*4.3.1.* The supply shall be delivered:
       (1) At the Seller´s terminal.
       (2) By tank trucks.
       (3) By bunkering barge.
(1, 2 and 3 are alternatives according to the supply mean agreed upon in the Commitment).

*4.3.2.* The Seller shall deliver the supplies to the Vessels strictly in their order of arrival, and it will not be liable for delays caused by congestion at the terminal or due to commitments previously contracted by the available barges or tanker trucks.

Vessels that do not meet their estimated or approximate time of arrival (ETA) will not be bunkered until other Vessels that have met their ETA have been supplied, and the Seller will not accept any complaints for delays lodged by the Buyer due to that reason.

In any case, passenger Vessels have absolute priority to be supplied.

*4.3.3.* Delivery conditions:
(i)   The Seller shall be entitled to deliver the Bunkers in special part deliveries, in which case each part delivery shall be construed as a separate delivery.
(ii)  The Seller shall not be required to deliver any bunkers for export, if any government permit required has not been obtained in due time before the delivery.
(iii) If the Seller at any time for any reason believes that there may be a shortage of supply at any place and that it as a result thereof may be unable to meet the demands of all its customers, the Seller may allocate its available and anticipated supply among its customers in such a manner as it may determine most reasonable in its sole discretion.

7

( ) The Vessel in question shall be bunkered as promptly as the circumstances permit. The Seller shall not be liable for any demurrage paid or incurred by the Buyer or for any loss, damage or delay of the Vessel of any nature whatsoever due to congestion at the loading terminal, prior commitments of available barges, seller´s terminal or tank-trucks or any other reason.

(i) The Buyer shall ensure that the Vessel provides a free, safe and always afloat and accessible side for the delivery of bunkers and that all necessary assistance as required by the Seller or the Seller's representative is rendered in connection with the delivery.

(ii) The receiving Vessel shall moor, unmoor, hoist bunkering hose(s) from the terminal, tanker truck or barge(s) respectively hose(s) whenever required by the Seller or the Seller's representative, free of expenses, and in any way requested to assist barge equipment to a smooth supply. The Buyer shall make and be responsible for all connections and disconnections between the delivery hose(s) and the Vessel's bunker intake manifold/pipe and ensure that the hose(s) are properly secured to the Vessel's manifold prior to commencement of delivery.

( ) During bunkering the Vessel's scuppers must be safely blocked, which blocking must be made by the Vessel's own crew. Furthermore, the Vessel must ensure that all pipes and manifolds and receiving tanks are completely checked and being ready to receive the bunkers, including but not limited to ensuring proper opening/closing of relevant valves, without any risk for spillages, etc., during the bunkering.

(i) In the case that the Buyer's Vessel is not able to receive the delivery promptly, the Buyer shall pay reasonable demurrage claim to the barging/supplying facilities.

(ii) Delivery shall be deemed completed and all risk, including loss damage, deterioration, depreciation, evaporation, or shrinkage as to the Bunkers delivered shall pass to the Buyer from the time the Bunkers reaches the flange connecting pipe lines/delivery hoses provided by the Seller.

(iii) If the Buyer for whatever reason is unable to receive the full quantity ordered and rendered, the Seller shall have the right to invoice the Buyer for the loss incurred by having to transport the Bunkers back to the storage or by having to sell the bunkers in a degraded form at a lower price than that applicable to the grade originally nominated by the Buyer. The Seller may use this right without prejudice to the Seller's other rights for damages or otherwise pursuant to these terms.

(iv) The Buyer shall also provide all the necessary services for adequate performance of the supply operation and guarantees that the Vessel to be supplied has sufficient tank capacity and bears equipment allowing the supply to be carried out with the required rate.

(v) Barge supplies will not be carried out at a rate under 200 m³/h, except if otherwise previously accepted by the Seller. Seller´s Terminal supplies will not be carried out at a rate under 100 m³/h, except if previously accepted by the Seller.

(vi) The Buyer also guarantees that the Vessel holds all the necessary certificates to comply with the regulations applicable to supplies of marine fuel at the moment, location or port of supply and shall instruct the Vessel's Master so that:

(1) He fulfils the applicable legislation, that is, most especially, the regulations of the port or place of supply, as it is always the Vessel and the Buyer who remains solely responsible for the awareness of such eventual additional requirements for safety reasons.

(2) He reports to the Seller in writing and prior to the supply on the maximum pumping capacity and pressure admitted by the Vessel. He must also report on the communication procedures and emergency measures to be followed in the event of a situation of risk or hazard arising during the bunker operation.

(3) He provides a free side to receive the supply and provide all the necessary assistance that may be required to fasten and/or cast off the supply barge, tank truck or seller´s terminal pipe from alongside.

(4) He provides and guarantees that the Vessel has sufficient tank space and equipment available to receive the Marine Fuel swiftly and safely. Should the Vessel not be

capable to receive all the quantities ordered by the Buyer, the Seller may charge a lumpsum per day plus any additional costs and expenses that it may suffer until the quantity not received can be delivered to another vessel.

(5) If possible, for the Vessel to have segregated tanks to receive the quantity of Marine Fuel ordered.

*4.3.4.* The Buyer shall compensate the Seller and maintain its indemnity before third parties for all and any damages and losses whatsoever resulting from or related to any act or omission by the Buyer, its Agents, employees, representatives, Vessel's Master, officers or crew, and/or any other person on board the Vessel and/or representatives or Agents of the Vessel in relation to the supply of Marine Fuel.

The Seller shall not be held responsible, in any case, for damages or losses of any nature whatsoever suffered by the Buyer as a result of:

(1) Exceeding, for reasons due to the Vessel, the time foreseen to commence or conclude the Marine Fuel bunkering operation.

(2) Any port fees related to supplies or delays arising from congestion in the port facilities, or difficulties in providing services all supply alternatives as described in clause 4.3.1.

(3) Lack of capacity of the tanks of the Vessel to be supplied to receive the supply just as agreed by the parties.

(4) Inadequacy and/or insufficiency of the receiving equipment or fuel storage tanks, or incorrect identification of the tanks on board the Vessel to be supplied.

(5) Non-compliance by the Vessel's Master, officers or crew, and/or any other person on board the Vessel and/or representatives or Agents of the Vessel, of the regulations for safety and protection of the environment applicable at the moment the operation takes place to supply Marine Fuel to the Vessel.

(6) Failure of Master and/or crew to give the order to stop the bunkering operations prior to the full capacity of bunker tanks of the Vessel, resulting or not in pollution.

*4.3.5.* Each supply constitutes a separate Contract.

*4.3.6.* The Buyer shall be liable for all the lumpsum referred to under sub-clause 4.1.1 above plus expenses, damages and losses caused to the Seller due to a delay exceeding two (2) hours in the arrival of the Vessel to be supplied at the location or port of supply, compared with the estimated time of arrival (ETA) notified according to the Sub-clauses above.

*4.3.7.* A delay exceeding four (4) days in the arrival of the Vessel to be supplied at the location or port of supply, compared with the estimated date and time of arrival (ETA) notified according to Clause One above, will be considered a breach by the Buyer, and the Seller may at its sole discretion automatically cancel the Contract, and all the rights and remedies of the Seller will be automatically reserved without need of further notice to the Buyer or its Agents.

*4.3.8.* Should there be a delay due to failure by the Buyer to duly provide notice, and/or breach of the notifications according to this clause 4.3, and/or the Vessel, during the reception of the Marine Fuels, does not comply with the pumping capacity mentioned in subclause 4.3.4 above, the Seller shall receive compensation from the Buyer for any such delay.

## 4.4. **Bunker Delivery Note (BDN):**

Once the supply is completed and the measurement of the quantity supplied performed and the applicable samples taken, the Seller shall present the Vessel a BDN that must be signed by the Vessel's Master or any other person acting in his name and behalf, and it will bear the Vessel's seal, confirming satisfactory delivery of the Marine Fuel on board the Vessel. Where the person

9

signing the BDN is not the Vessel's Master, the Buyer represents and warrants to the Seller that the signing person has full authority to bind the Vessel *in rem*.

The Seller will keep the original signed BDN and will deliver a copy of the BDN to the Vessel's Master or to her representative or Agent.

The BDN will remain "clean" in all cases and shall not include any kind of protest or remarks whatsoever. Any remarks whatsoever and specifically any "no lien" or equivalent mention will never be accepted and will be null and void if written or inserted by any other means in a BDN.

The signature of Master of the Vessel or any other person acting in his name and behalf of the BDN shall amount to a ratification of the Contract in the name of the Vessel's Owner. If, for any reasons whatsoever, the BDN is not personally signed and stamped by the Master of the Vessel, the person signing it undertakes, represent and guarantees that he has authority to sign on behalf of the Master and/or the Owner, Disponent Owner or Operator of the Vessel so as to bind the Vessel *in rem*. Should the BDN not include the Owner's name in the applicable box due to lack of information from the Buyer or Broker or for any other reasons, the Owner will be determined as per the Master or its representing person seal stamped in the BDN.

The BDN shall insert all and any regulatory mentions as may be requested from time to time under MARPOL Annex VI and its Appendixes, but in no circumstances, it may create an implied term that the Seller has a duty to inspect the Vessel's compliance with any IMO's Conventions and Regulations on her fitness to comply with sulphur emissions cap or any other applicable ones. The Seller's responsibilities under the BDN are limited to the declarations of conformity of the Marine Fuels incorporated to the BDN.

### 4.5. Supply through Coriolis Mass Flow Meter:

When Custody Transfer could be confirmed, the Seller shall inform in writing to the Vessel Representative and prior to the Delivery, that the supply of Marine Fuel will take place though a Coriolis Mass Flow Meter System and according to CEPSA Mass Flow Meter Operative Procedure in force at the time of Delivery.

## 5. MEASUREMENT AND SAMPLING:

### 5.1. Measurement:

*5.1.1.* The amount of Marine Fuel to be supplied in accordance with the Final Supply Order and the Supply Offer will be measured, determined and calculated according to the generally accepted methods, using the supply equipment and measurement appliances of the Seller to that end.

*5.1.2.* The measurements taken on board the Vessel supplied shall not be binding on the Seller, so any claim concerning the amount of Marine Fuel supplied based on measurements taken on board the Vessel shall be completely inadmissible and irrelevant.

*5.1.3.* Should the Buyer require independent inspection with regard to measurement of the Supply it must request it in writing necessarily in its Request of Supply to the Seller, proposing at the same time the independent inspector to be named, subject to the specific agreement by the Seller in the Sale Offer. The outcome of that independent inspection shall not in any case be binding upon the Seller, except if specifically accepted in the Sale Offer. The expenses arising from supervision of measurement of the Supply will, in all cases, be exclusively borne by the Buyer.

*5.1.4.* The Buyer and/or Vessel's Master supplied shall be entitled to be personally present at the measurements, or through a representative specifically appointed for that purpose. The total or partial absence of the Buyer and/or the Vessel's Master, or their respective representatives during the measurement taking operation is irrelevant, and the measurement taken by the Seller shall be conclusive and binding evidence for the parties of the amount of Marine Fuel supplied, and any claim to the Seller concerning the quantity supplied will not be considered.

*5.1.5.* The provisions of sections above are understood to be notwithstanding the rights and obligations that might be established in the laws in force at any Delivery Port as to measurement of bunker supplies.

5.2. <u>Sampling</u>:

*5.2.1.* The Seller shall take three (3) commercial samples of each degree of Marine Fuel supplied during the bunker operation, in the presence of the Buyer or the Vessel's Master, or their respective representatives.

Such commercial samples shall be the only authentic, conclusive, binding proof for the parties, to determine the quality of the Marine Fuel supplied to the Vessel, and the absence of the Buyer or the Vessel's Master or their respective representatives during the sample taking process shall be considered irrelevant to those ends.

*5.2.2.* The samples taken will be duly sealed and bear labels showing the name of the Vessel, identifying the means of supply of the Marine Fuel, name of the product, date and place of supply, and they will also bear the seal of the Vessel's or the Vessel's Owner Company and be signed by the Seller and the Vessel's Master or his representative.

*5.2.3.* The Seller shall deliver one of the commercial samples to the Master of the Vessel bunkered or his representative, who shall acknowledge receipt of the same at the time of delivery. The other two commercial samples shall remain in the possession of the Seller for thirty (30) days from the date of the Supply. The Seller will hold one of those samples in custody.

When the aforementioned 30 days have elapsed, and if no written claim has been lodged, the Seller is empowered to proceed to destroy the commercial sample or samples held by it.

In supplies under 30 MT as well as in all supplies by tanker truck, the Seller will not take commercial samples, except when asked to do so by the Buyer in writing and at least 48 Working Hours before the supply, and the Buyer shall accept and pay for the cost of same.

*5.2.4.* Pursuant to the terms and conditions set forth in Addendum VI of Marpol Convention 73/78, for all Vessels with a GT of more than 400, the Seller shall take two (2) samples of each grade of Marine Fuel supplied during each supply operation, in the presence of the Buyer or the Vessel's Master, or their respective representatives.

The samples taken will be duly sealed and bear labels identifying them specifically as "Marpol Sample", showing the name of the Vessel, identifying the means of supply of the Marine Fuel, name of the product, date and place of supply, and they will bear the seal of the Vessel Owner Company and be signed by the Seller and the Vessel's Master or her representative.

The Seller shall give one of these samples to the Vessel's Master or his representative, who will acknowledge BDN of the aforementioned sample in the moment of reception.

Any further amendments of the Addendum VI of Marpol Convention that may enter into force once approved by the IMO shall be deemed automatically incorporated to these General Terms and Conditions, unless otherwise specified in the Special Terms of the Contract.

*5.2.5.* The commercial samples will be taken, according to the supply method used, at the following points:
    (1) At the manifold of the supply barge.
    (2) At the manifold of the land terminal from which the supply is made.
    (3) At the manifold of the tanker truck, if the delivery of samples is necessary according to subparagraph 5.2.4 above.

*5.2.6.* The samples will be taken using the methods, as well as the appliances and devices to take samples provided by the Seller.

## 6. AGENTS:

*6.1.* If the Commitment is made by an Agent acting for or on behalf of the Buyer, whether such agency is disclosed or undisclosed, then such Agent shall be liable (as well as the Buyer) not only as Agent but also as principal for the performance of all the obligations of the Buyer.

*6.2.* The Buyer represents and warrants to the Seller when the Buyer is not the owner and/or disponent of the Vessel that:

i)    It is acting as duly named and appointed Agent of the owner and/or the disponent owner of the Vessel;
ii)    It has full authority to bind to the owner and/or disponent owner of the Vessel;
iii)    It has informed to the owner and disponent Owner of the Vessel about the Seller being the actual supplier of the Bunkers and that these General Terms and Conditions are in force and applicable to the Delivery;
iv)    These General Terms and Conditions are incorporated to its own general terms and conditions of sale and have been duly notified to the Vessel's Owner in writing.
v)    That the Master/Owner or Disponent Owner have selected or authorised the Agent to select the Seller as supplier of the Marine Fuels to the Vessel.

## 7. THIRD PARTY PORTS:

The Parties acknowledge that at certain Delivery Ports the Delivering Company may be a third party which is not a Cepsa Affiliate. The Seller shall notify the Buyer of such fact at the time of nomination. Where delivery at such Delivery Ports is requested by the Buyer, the terms and conditions on which Marine Fuels are supplied may be different from these terms and conditions, such differences must be agreed in writing by the Buyer and failing agreement the Seller will supply on these terms and conditions. A copy of any such terms and conditions will be provided by the Seller to the Buyer's at the latest's request.

## 8. TITLE AND RISK:

### 8.1. Title:

Title of the Marine Fuel is transferred to the Buyer once it has fully paid the purchase price to the Seller. Up to that moment, the Seller shall continue to be the owner of the Marine Fuel supplied. In the event of the Marine Fuel having been mixed with other fuel aboard the Vessel bunkered,

the Seller will be entitled to the part of the mixed fuel that is equivalent to the quantity and quality of the Marine Fuel supplied. The Seller will be entitled to request the return of the fuel remaining on board, as foreseen in the laws in force.

## 8.2. Risk:

Risk in and of the Marine Fuel is transferred to the Buyer at the moment it passes the loading flange on the Vessel supplied. At that moment, the Seller shall cease to be responsible for the damage suffered or caused by the Marine Fuel supplied. More precisely, the Seller shall not be held liable for the losses or damages caused by leakage, fire, spills, escapes, shrinkage and/or overflowing of the Marine Fuel or for the risk or damage of shrinkage, contamination or loss suffered by the latter.

## 9. QUANTITY AND QUALITY CLAIMS:

### 9.1. Letter of Protest:

Should the Master of the Vessel supplied not agree with the quantity or any other circumstance related to the Marine Fuel or its supply, he must state these circumstances in a Letter of Protest, which must be delivered to the Seller within twenty-four (24) consecutive hours following the supply of Marine Fuel.

### 9.2. Term for documentation:

Any claim of quality that has been notified within the term provided in said clause 9.1 must be notified to the Seller duly documented within 30 days following the date of supply of the Marine Fuel. Claims over quantity that have not been made within the term and in the manner foreseen in Clause 9.1, or documented within the term foreseen in this clause, shall be considered finally expired and not to have been made if received after the term.

### 9.3. Specific rules for quality claims:

*9.3.1.* Any quality claim shall be noticed by the Buyer to the Seller by letter of protest signed by the Master in twenty-four (24) hours since it was discovered and shall be finally time barred if the quality claim is not noticed and duly documented within thirty (30) days of the date of delivery. Both parties shall be obliged to extend the maximum term to keep the commercial sample provided in clause 5.2.3 above until the commercial sample or samples are analysed.

*9.3.2.* The parties expressly agree that the commercial sample retained in custody by the Seller, as established in clause 5.2.3 above, shall be analysed by a qualified independent laboratory of international prestige, specialised in performing analysis of marine fuels, appointed by mutual agreement between the parties.

The result of such analysis shall be conclusive and binding for both parties. The expenses incurred in performing such analysis shall be borne by the losing party. The analysis shall be performed according to the criteria and instructions agreed by the parties, always with regard to the quality guaranteed by the Seller.

*9.3.3.* The analysis of the commercial sample retained by the Seller shall be done within three months (3) from the date of delivery. Seller undertakes to cooperate with Buyer to execute the said analysis before the deadline.

13

In case the analysis of the commercial sample retained by the Seller is not executed for any reason attributable to Buyer before the referred deadline, the Buyer's claim shall be automatically null and void without any need of further notification from the Seller.

*9.3.4.* The Seller is only answerable, responsible or liable for the quality of the Marine Fuels included in their technical description in the Confirmation of Supply and not for any other implied quality standards.

*9.3.5.* Time is of essence in quantity and quality claims. Any claim made out of the terms stated in this clause 9 and any lack of documentation of the claim shall cause the claim to be time barred, null and void.

*9.3.6* Any other claim that is not related to the quality and/or quantity of the Marine Fuel must be notified by the Buyer to the Seller in writing, including all the documentation available to prove and justify such a claim, within the term of thirty (30) days from the supply.

Should such notice not be provided, any claim will be automatically time-barred and will be considered not to have been lodged.


## 10. UTILISATION OF BUNKERS:

The Buyer guarantees to the Seller that the bunkers supplied shall be used exclusively by the Vessel.


## 11. ORIGIN:

Except if otherwise agreed in the Sales Contract, the Seller does not expressly or impliedly guarantee any specific custom's origin of the Bunkers, save that the Sellers warrant that the Marine Fuels are not of an origin or have been exported as a product from a place that is subject to any of the sanctions, prohibitions, restrictions or designation referred to in clause 20 herein.


## 12. PRICE AND PAYMENT:

**12.1.** The price shall be that stipulated by the Seller in the Confirmed Nomination, or in its express acceptance of the new conditions proposed by the Buyer as per clause 3 above.
   Any of all taxes, duties or charges of all kind imposed upon the Seller by any Authority, related to or due to the production, storage and supply, transport, distribution, sale or commercialisation of the Marine Fuel, will be paid by the Buyer to the Seller.

**12.2. Invoicing:**

*12.2.1.* All the invoices shall be issued in Euros or U.S. Dollars (or any other currency specifically agreed by the parties in the Specific Terms). The payment shall always be made in the currency agreed by the parties.

*12.2.2.* The price of the Marine Fuels supplied shall be paid by the Buyer to the Seller in full, without any deduction, discount, compensation or withholding whatsoever, and without deductions due to difference in the currency exchange indexes, free of bank charges to the Seller, on delivery of the invoice sent by the Seller to the Buyer, according to the terms of payment established in the Sale Offer.

14

### 12.3. Payment:

The sale price is payable in all cases, notwithstanding any claim of any nature whatsoever that may be presented by the Buyer against the Seller.

*12.3.1.* Any delay or failure to pay the price of the Marine Fuel supplied by the Seller shall accrue a delay interest of 0.83 % per month.

*12.3.2.* In the event of any invoice being unpaid five (5) calendar days after its due date, the Seller may:

> (1) Refrain from providing new supplies pending delivery to the Buyer as well as to third parties on its behalf.

> (2) Claim to the Buyer all the expenses of recovery (including but not limited to judicial expenses and taxes and lawyer's fees) of any of the aforementioned sums.

*12.3.3.* Partial payment of an invoice is not equivalent, in any case, not even in the case of claims by the Buyer pending resolution, to effective payment and, thus, the Seller shall effectively be entitled to full collection of the sums it is owed and the debit balance shall attract interest at the rate mentioned in section 12.3.1 above.

*12.3.4.* The Buyer and the Vessel Owner Company shall be joint and severally liable for payment of the price of the Marine Fuels supplied and, thus, the Seller may enforce his credit, in the manner and within the legal limits foreseen, on the Vessel bunkered and on the chartered goods accrued thereon.

*12.3.5.* The sum owed by the Buyer for payment of the price of the Marine Fuels supplied, plus the interest and expenses accrued, may be compensated with other debts that the Seller may have in front of the Buyer or any of its Affiliates, arising from other commercial transactions with the Buyer, with the exception of debts that do not allow such compensation by mandatory legal provision.

## 13. TAXES AND ASSESSMENTS:

*13.1.* The Buyer will pay the Seller the amount of all excise, gross delivery, import, motor fuel, superfund and spill taxes, and all other federal, state and local taxes (collectively, "Taxes and Assessments") or the foreign equivalent (other than taxes on income), and paid or incurred by the Seller directly or indirectly with respect to the Products and/or on the value thereof insofar as the same are not expressly included in the price quoted. Any additional Taxes and Assessments incurred by Seller arising from any Delivery and imposed by any governmental and/or any regulatory authority after delivery as a result of an audit, whether domestic and/or international, shall be borne solely by Buyer.

*13.2.* The Buyer will present the Seller with any required documentation, including but not limited to registrations, exemptions, certifications, claims, refunds, declarations or otherwise, in a form and format, and on or before whatever due date the Seller shall require, to satisfy the Seller's concerns in connection with any of the above taxes or assessments. Further, the Buyer shall indemnify and hold the Seller harmless for any damages, claims, liability or expense the Seller might incur due to the Buyer's failure to comply with this requirement.

*13.3.* The Buyer shall, upon written request of the Seller, send to the Seller a valid and updated certificate of tax residence issued by the applicable tax authority of the Vessel's Flag State.

*13.4.* For the avoidance of doubt, all supplies agreed by the Seller imply the direct delivery to the Vessel without title and risk being passed onto any agent, broker, trader, or any other Buyer whatsoever prior to the delivery of the Bunkers to the Vessel.

*13.5.* Any claim that the Seller may have against the Buyer or any of its representatives for tax liabilities under this section 13 will survive until the time-bar or term applicable to any tax assessment under the applicable tax laws and regulations.

## 14. CHARGES:

In addition to the prices payable for Marine Fuels, the Buyer shall pay the following charges:

(a) Any expenses incurred as a result of the Master of the vessel rejecting the whole or any part of the delivery under a Commitment;

(b) Any mooring or unmooring charges or port dues which may be incurred by the Seller in connection with any vessel to which Marine Fuels are delivered hereunder;

(c) Any duties, taxes (other than taxes on profits), impositions, charges, freights, premiums, or other costs incurred by the Seller, or for which the Seller is accountable, in respect of deliveries of Marine Fuels under a Commitment;

(d) If the Seller (not having duty-free stocks available, and the Buyer first having been advised that this is the case) delivers to the Buyer from duty paid stocks, the amount of such duty;

(e) Any additional costs incurred by the Seller in respect of deliveries made under a Commitment including payments for overtime.

## 15. LIEN:

**15.1.** Deliveries of Marine Fuel under the Contract are made not only to the credit of the Buyer but also on the reliance whether expressly or impliedly accepted by the Buyer, the Agents and the Master that they have full authority and capacity to engage the Vessel into the Contract and bound her *in rem* and it is hereby expressly agreed that the Seller will have and may assert a lien for the price of the Marine Fuel delivered and that the Buyer and its assignees or creditors shall have no lien against the Vessel except if and when they have paid in full to the Seller. The Seller shall not be bound by any attempt by any person to restrict, limit or prohibit its lien or liens attaching to a vessel.

**15.2.** Products and Services delivered under a Contract shall be made not only on the account of the Buyer, but also on the account of the receiving Vessel. When the Buyer is not the Owner of the Vessel, it represents and warrants to the Seller and its Agents that the Vessel's owner has given the Buyer, Agent and Master, as applicable, express authority to purchase the Products. The Buyer further warrants that the Seller has the right to assert and enforce a lien in accordance with clause 15.1 herein against the receiving Vessel or any sister or associated Vessel for the amount of the Products and Services provided, plus without limitation, contractual interest pursuant to Clause 12.3.1 herein and any other expenses related to enforcement of the lien. The Buyer expressly warrants that it has the authority of the Vessel's owner to pledge the Vessel's credit as aforesaid. The Vessel is ultimately responsible for the debt incurred through the Contract. The Supplier's right to apply and enforce a maritime lien will not be altered, waived or impaired by the application to the Bunker Delivery Note of any disclaimer stamp.

**15.3.** In event of a breach of this Contract by the Buyer, the Seller will be entitled to start any such action or remedy as it shall in its absolute discretion consider necessary to enforce,

safeguard or secure its right under this Contract in any court or tribunal of any state or country, including, but not limited to the action to enforce its rights of lien against Vessels, the existence and procedure of enforcement of such right of lien being determined by the local law of the place where enforcement is sought, or to otherwise obtain security by seizure, attachment or arrest of assets for any amount(s) owed to Seller.

**15.4.** Irrespective of any applicable Law, the Buyer represents and warrants to the Seller that it will have the right to arrest the Vessel for unpaid and that the Buyer, the Owner and its Agents shall not by any means oppose to any arrest of the Vessel requested by the Seller except if the Marine Fuels have been duly and completely paid.

**15.5.** <u>**Automatic assignment of rights, remedies and actions against the Vessel and the Vessel's Owner**</u>. Should the Buyer not timely pay the purchase price to the Seller, all and any actions and remedies whether in rem or *in personam* that the Buyer may have against the Vessel and the Vessel's Owner and/or Disponent Owner (as applicable) shall be automatically assigned to the Seller that will be entitled, at its sole discretion and without need of any further notice, to start any such legal actions and remedies against the Vessel and her Owner and/or Disponent Owner (as applicable), including, but not limited any rights to arrest the Vessel in any jurisdiction. By the said automatic assignment the Seller shall be also automatically subrogated in the contractual position and the Buyer against the Vessel's Owner.

# 16. LIABILITY AND INDEMNITY:

## 16.1. <u>Limitation on Liability:</u>

*16.1.1.* The liability of the Seller for any loss, damage, claim or other expenditure arising out of or in connection with the failure by the Seller to perform its obligations under this Contract shall not exceed and shall be limited to:
(i)    The removal at a reasonable location to be agreed between the Seller and Buyer of any Marine Fuel delivered which is not in accordance with the Contract and is unsuitable for use on board the vessel, and either (a) the replacement by the Seller of such Marine Fuel, or (b) reimbursement of the cost (as evidenced by invoice at market price) of such Marine Fuel; and
(ii)   The reasonable repair costs of any components that are physically damaged as a direct result of using any Marine Fuel supplied by the Seller which is not in accordance with the Contract; and
(iii)  The losses, damages, claims or expenses arising from the death or personal injury to any person caused by the Seller's negligence.

The Seller shall have no obligation to make any payment to the Buyer under this clause 16.1.1. unless and until the Seller has received full payment from the Buyer of all sums due in accordance with Clause 12.

*16.1.2.* The Seller and/or Supplier shall not be liable for any special, indirect, consequential, punitive or exemplary damage of any kind including but not limited to loss of prospective profits, anticipated cost savings, contracts or financial or economic loss, claims in tort including negligence of the Seller and/or Supplier, its agents, servants or sub-contractors, arising out of, or in connection with, the performance or non-performance under the Contract. In any event, the liability of the Seller and/or Supplier shall be limited to the price of the Products supplied under the Contract.

17

*16.1.3.* The Seller shall not be responsible for any claim arising from commingling of Marine Fuels delivered by the Seller with other fuel aboard the vessel.

*16.1.4.* If the Buyer removes Marine Fuels without the consent of the Seller, all removal and related costs shall be for the Buyer's account.

*16.1.5.* Nothing in the Contract shall in any way limit the Buyer's obligations to mitigate any of its losses in accordance with this Clause 16.

*16.1.6.* The Buyer shall indemnify and hold the Seller, Seller's Affiliates and the directors, employees and agents and Seller's Affiliates harmless against all claims, liabilities, loss, damage, costs fines, penalties and expenses whatsoever and by whomsoever brought arising in connection with any delivery of Marine Fuels except to the extent that such claims, liabilities, loss, damage, costs, fines, penalties and expenses are caused by the negligence of the Buyer or Buyer's Affiliates, or breach by the Buyer of its obligations under the Contract.

*16.1.7.* The provisions of this Clause 16 shall continue to apply notwithstanding the termination or expiry of the Contract for any reason whatsoever.

## 17. FORCE MAJEURE AND OTHER EXCEPTIONS:

None of the parties will be responsible in the event of breach or defective fulfilment of any of the terms and conditions herein when this is due to causes of Force Majeure.

For the purposes of these General Terms and Conditions, Force Majeure is understood as all foreseeable or unforeseeable events that, being beyond the control of the parties, could not be avoided by these by use of reasonable means, that have a direct effect on its execution, preventing or hindering, beyond what is reasonable, the fulfilment of the obligations arising from these General Terms and Conditions. This item expressly excludes the payment obligations of the Buyer with regard to the "MARINE FUEL" supplied.

The party that, due to this reason, is prevented from performing the Contract, shall inform the other party without delay and will take all measures reasonably available to it to eliminate the cause of hindrance, or to palliate its effects on the Contract, it being duly understood that it will re-establish fulfilment of the Contract as soon as possible after elimination of that cause. If the situation persists for more than one (1) month, the party not affected by the Force Majeure may decide to terminate this Contract.

Under no circumstance will Force Majeure cause obligations to pay money to be waived. Moreover, in the event of Force Majeure preventing or suspending the supply for a term exceeding 15 days, the Seller may terminate the Sale.

To these ends, Force Majeure is understood (without this being limiting) as all cause of such like:
(i)  War, hostilities, blockades, riots, civil uprising, strike, lockout, labour or employment litigation, epidemics, fire, flooding. ice, hazards of the sea, other eventualities caused by nature;
(ii) prohibition to import, export or on transit, or other executive or legislative action by any government in the country of origin, or within the territory to which it or its raw materials are to be supplied; and (iii) total or partial failure of the means of supply, problems in transport that affect the fuel that is to be supplied, or its raw materials. outage in the supply of energy or other causes or circumstances that aggravate any existing difficulty at the time of the contract and that affect the possibility of supplying the Marine Fuels ordered.

**18.** SUSPENSION, BREACH AND TERMINATION:

**18.1.** Without prejudice to any other rights and remedies, the Seller may by notice either orally (confirming such notification in writing) or by written notice to the Buyer terminate or suspend delivery of any commitment with immediate effect if:

(a) The Buyer is in breach of any of its obligations under any other Commitment with the Seller or its Affiliates and fails to remedy such breach within 30 days after written notice of the existence of such breach;

(b) There is a Change of Control of the Buyer;

(c) The Buyer or any guarantor of the Buyer should go into liquidation or should do or suffer any similar act or thing under any applicable law, such as (a) the making of a general assignment for the benefit of creditors by the Buyer; or (b) the entering into any arrangement or composition with creditors (other than for the purposes of a solvent reconstruction or amalgamation); or (c) the institution by the Buyer of proceedings seeking to adjudicate the Buyer as bankrupt or insolvent, or seeking protection or relief from creditors, or seeking liquidation, winding up, or rearrangement, reorganization or adjustment of the Buyer or its debts (other than for purposes of a solvent reconstruction or amalgamation), or seeking the entry of an order for the appointment of an administrator, a receiver, trustee or other similar official for the Buyer or for all or a substantial part of the Buyer's assets; or (d) the institution of any proceeding of the type described in (c) above against the Buyer; or

(d) Anything analogous to any of the events described in paragraph (c) happens to or in relation to the Buyer in any jurisdiction.

**18.2.** Subject to subsection 18.3, a Change of Control shall occur for the purposes of these terms and conditions where:

(a) a person acquires Control of the Buyer where no person previously had Control of the Buyer; or
(b) the ultimate parent company of the Buyer ceases to have Control of the Buyer; or
(c) a person acquires Control of the ultimate parent company of the Buyer; or
(d) a person who is not under the Control of the ultimate parent company of the Buyer acquires Control of the Buyer.

**18.3.** For the purposes of these terms and conditions, Control means, in relation to any company, having legal and beneficial ownership of not less than 50 per cent of the voting rights attached to the issued share capital of that company.

**18.4.** On termination of any Commitment all sums owed to the Seller shall become immediately due and payable.

**18.5.** Without prejudice to any other rights or remedies, Seller may suspend deliveries or vary the stipulated method of payment with immediate effect if the Buyer is in breach of any of its obligations under any Commitment.

**18.6.** In the case of multiple deliveries under the Contract, notwithstanding anything else to the contrary express or implied elsewhere herein, (but always without prejudice to Seller's other rights at law and under the Contract), the Seller may at its sole discretion either terminate the Contract immediately or immediately suspend delivery under the Contract until

further notice, on notifying the Buyer either orally (confirming such notification in writing) or by notice in writing, if the Buyer fails to make any payment due to the Seller under the Contract in full and punctually by the due date.

## 19. RESTRICTIONS:

To the extent that Marine Fuel is sold or to be sold to the Buyer on a duty or tax exempt basis, Buyer shall comply with all local requirements and shall execute all such documents necessary to permit the sale on such basis, including any declarations on use of the Marine Fuel. To the extent that a claim is made by any authorities against the Seller or Delivering Company on the basis that such Marine Fuel was liable for duty or taxes and such claim arose partly or wholly due to the action, omission or fault of the Buyer (including any use of Marine Fuel in domestic waters), then the Buyer shall indemnify Seller and Delivering Company against any claims, losses, costs (including costs as between Attorney or Solicitor and Client), damages, liabilities, fines, penalties and expenses attributable to such action, omission or fault of the Buyer.

## 20. PROHIBITED COUNTRIES:

**20.1.** Buyer acknowledges that it is familiar with and will comply with all applicable laws and regulations relating to the use, diversion, trade, export or re-export of Marine Fuels. Without prejudice to the foregoing, where requested to do so by Seller, Buyer will supply Seller with evidence that controls are in place, which actively support such compliance.

**20.2.** Without prejudice to section 20.1, Buyer undertakes not to export, re-export, divert, trade, ship, import, transport, store, sell, supply, deliver or re-deliver, whether directly or indirectly, the Marine Fuels to or in any Prohibited Country and not to do the same to or for the end use by any entity or vessel associated with any Prohibited Country.

**20.3.** If Buyer is, or is likely to be, prevented by any law, policy, demand or request to which it is subject or any governmental policy, demand or request by which Buyer reasonably considers it is bound, from complying with the above, then (without prejudice to Buyer's obligations as set out in this section 20) Seller and Buyer shall meet and discuss the implication for Buyer and Seller and, pending resolution of any difficulty which such law causes or is likely to cause, Seller may at its discretion, and without liability therefore, suspend in whole or in part supplies hereunder without prejudice to any claims that Seller may have under this Agreement.

**20.4.** Buyer further undertakes that the prohibition stipulated in this section 20 shall also be imposed by Buyer on any resale customers of Buyer, together with a communication to such resale customers to communicate such said prohibition on any resale customer of theirs.

**20.5.** From time to time, at the reasonable request of the Seller, the Buyer will confirm in writing that it has complied with its undertakings under this clause and will provide any information reasonably requested by the Seller in support of such compliance.

## 21. HEALTH AND THE ENVIRONMENT:

**21.1.** If in the course of any delivery under a Commitment there is any escape or spillage of Marine Fuels:

(a) The Buyer agrees that, if a Pollution Event occurs before, during or after delivery of the Marine Fuels, the Seller or the Delivering Company may at its sole discretion take reasonable steps to control and terminate the Pollution Event, contain and remove the escaped Marine Fuels and clean the affected area. The Buyer must afford the Seller and the Delivering Company its reasonable co-operation in implementing steps under this section. If the Pollution Event is caused by an act or omission of the Buyer, its servants or Agents (other than the Seller and the Delivering Company), the Buyer must indemnify the Seller and the Delivering Company for the cost of any steps taken under this section 21.1(a). If both parties are at fault, all expenses, claims, losses, damages, liabilities and penalties shall be divided between the parties in accordance with the respective degrees of fault. "Pollution Event" means any occurrence as a result of which the Marine Fuels escaped onto or into land or water.

(b) The Buyer shall supply the Seller with any documents and information concerning the Pollution Event or any programme for the prevention thereof as are requested by the Seller or are required by law or regulations applicable at the Delivery Port.

**21.2.** The Buyer shall be fully responsible for the proper use, maintenance and repair of the Equipment. The Buyer will immediately inform the Seller of any defects, ruptures, spills or other problems with or related to the equipment which may occur during the delivery process.

**21.3.** The Buyer will provide ready and safe means of access to the Equipment for delivery of the Marine Fuels at the Delivery Port and shall not obstruct access to the Equipment for delivery. Delivery will not commence until such time as the Pre-delivery Check List has been jointly and satisfactorily completed and signed by or on behalf of both the Seller and the Buyer.

**21.4.** The Seller and the Buyer represent to each other that they are in compliance with all applicable laws and government regulations with respect to the environment and that they have policies of environmental responsibility in place concerning their respective Marine Fuels processes.

## 22. NEW AND CHANGED REGULATIONS:

**22.1.** It is understood by the parties that the parties are entering into a Contract in reliance on the laws, rules, regulations, decrees, agreements, concessions and arrangements (hereinafter called "Regulations") in effect on the date hereof with governments, government instrumentalities or public authorities affecting the Marine Fuels sold hereunder including, but without limitation to the generality of the foregoing, those relating to the production, acquisition, gathering, manufacturing, transportation, storage, trading or delivery thereof, insofar as such Regulations affect the Seller.

**22.2.** In the event that at any time and from time to time during the term of a Commitment any Regulations are changed or new Regulations become effective whether by law, decree or regulation or by response to the insistence or request of any governmental or public authority or any person purporting to act therefore, and the effect of such changed or new Regulations (a) is not covered by any other provision of these terms and conditions, and (b) has a material adverse economic effect upon either the Seller or the Buyer, then the Seller or the Buyer (as the case may be), shall have the option to request renegotiations of the prices or other pertinent terms provided for in these terms and conditions. Said option may be exercised by the relevant party at any time after such changed or new Regulation is promulgated, by written notice of desire to renegotiate, such notice to contain the new prices or terms desired by that party. If the parties do not agree

21

upon new prices or terms within thirty (30) days after the relevant party has given such notice, the relevant party shall have the right to terminate any Commitment at the end of the said thirty (30) day period. Any Marine Fuels lifted during such thirty (30) days period shall be sold and purchased at the price and on the terms applying hereunder without any adjustment in respect of the new or changed Regulations concerned.

## 23. ANTI-CORRUPTION AND SANCTIONS:

**23.1.** Each Party warrants and undertakes to the other that in connection with the sale and purchase of Marine Fuels under this Contract they will each respectively comply with all applicable laws, regulations, rules, decrees and/or official government orders and requirements of the European Union, the United Kingdom, the United States of America or any other relevant jurisdiction relating to anti-bribery or anti-money laundering.

**23.2.** Each Party represents, warrants and undertakes to the other that it shall not, directly or indirectly pay, offer, give or promise to pay or authorise the payment of, any monies or other things of value to:
(i)     a Government Official;
(ii)    any director, officer, employee, or agent/representative of an actual or prospective counterparty, supplier or customer of the Buyer or Seller; or
(iii)   any other person, individual or entity at the suggestion, request or direction or for the benefit of any of the above-described persons and entities, or engage in other acts or transactions, in each case if this is in violation of or inconsistent with the anti-bribery or anti-money laundering legislation of any government, and the applicable country legislation implementing the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

**23.3.** Each Party may terminate the Contract forthwith upon written notice to the other Party at any time, if in its reasonable judgment the other Party is in breach of any of the representations, warranties or undertakings contained in these General Terms and Conditions or elsewhere in the Commitment.

**23.4.** If at any time during the performance of this Contract either Party becomes aware that the other Party is in breach of warranty as aforesaid, the Party not in breach shall comply with the laws and regulations of any Government to which that Party or the Vessel is subject and follow any orders or directions which may be given by any regulatory or administrative body, acting with powers to compel compliance. In the absence of any such orders, directions, laws or regulations, the Party not in breach may terminate this Contract forthwith.

**23.5.** Notwithstanding anything to the contrary in this Clause, Buyers and Sellers shall not be required to do anything which constitutes a violation of the laws and regulations of any State to which either of them is subject.

**23.6.** The Buyers and the Sellers shall be liable to indemnify the other Party against any and all claims, including return of any Payment, losses, damage, costs and fines whatsoever suffered by the other Party resulting from any breach of warranty as aforesaid and in accordance with this Contract.

24.    RECORDING,    RETENTION    AND    MONITORING    OF
       COMMUNICATIONS:

Each party hereby acknowledges to the other party and consents that such other party may
without any further notice and to the extent permitted by law:

i) Record and retain electronic transmissions (including telephone conversations, e-mail, and
instant messaging between the parties' respective representatives in connection with the
Agreement or other commercial matters between the parties) on central and local databases for
their respective legitimate purposes, including but not limited to be used as evidence;

ii) Monitor electronic transmissions through their internal and external networks for purposes of
security and compliance with applicable laws, regulations and internal policies for their
legitimate business purposes.

25. APPLICABLE LAW AND DISPUTE RESOLUTION:

This Contract shall be governed by and construed in accordance with Title 9 of the United States
Code and the Maritime Law of the United States and any dispute arising out of or in connection
with this Contract shall be referred to three (3) persons at New York, Madrid o Singapore at the
Seller exclusive option, one to be appointed by each of the parties hereto, and the third by the
two so chosen; their decision or that of any two of them shall be final, and for the purposes of
enforcing any award, judgment may be entered on an award by any court of competent
jurisdiction. The proceedings shall be conducted in accordance with the rules of the Society of
Maritime Arbitrators, Inc. In cases where neither the claim nor any counterclaim exceeds the sum
of USD 100,000 (or such other sum as the parties may agree), the arbitration shall be conducted
in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators,
Inc.

26. MISCELLANEOUS:

26.1. Amendments and variations:
These terms and conditions may not be amended or modified orally and no amendment or
modification shall be effective unless it is in writing and signed by authorized representatives of
each of the Seller and the Buyer.

26.2. Notices:

Any Party giving notice under this Contract shall ensure that it is effectively given and such notice
shall be treated as received during the recipients' office Working Hours. If such notice is sent outside
the recipients' office hours it shall be treated as received during the recipients' next working day.

26.2.1. Except where expressly stated otherwise, a notice, demand, request, statement, or other
communication under or in connection with a Commitment shall only be effective if it is in writing.

26.2.2. Notices, demands, requests, statements or other communications under or in connection with
a Commitment shall be sent to a party at the e-mail addresses or numbers specified from time to time
by the party to whom the notice is addressed.

*26.2.3.* Any notice given under or in connection with a Commitment shall be effective only upon actual at the address specified in the Commitment.

*26.2.4.* Any notice given under or in connection with a Commitment outside working hours in the place to which it is addressed shall be deemed not to have been given until the start of the next period of working hours in such place.

*26.2.5.* No notice given under or in connection with a Commitment may be withdrawn or revoked except by notice given in accordance with this section.

*26.2.6.* Where a Commitment is made by an Agent acting for the Buyer then notice may be given either to the Agent or to the Buyer at the option of the Seller.

26.3. <u>No waiver</u>:

The failure of either of the parties to enforce any of the provisions of any Commitment at any time shall not be construed as a waiver of that provision unless specifically so notified by that party in writing which expressly states it is a waiver. No waiver of any breach of a Commitment shall be held to be a waiver of any other breach or a continuing waiver of any further breach of a Commitment.

26.4. <u>Waiver of immunities</u>:

Buyer expressly and irrevocably waives and agrees not to assert such a defense in an action or proceeding, which may be commenced or asserted against Buyer or Buyer's revenues and/or assets in connection with any Contract to the fullest extent permitted by applicable law, with respect to Buyer and Buyer's revenues and/or assets (irrespective of their use or intended use), all immunity on the grounds of sovereign immunity or other similar grounds, where Buyer is a State or Government owned or controlled entity, whether in whole or in part or otherwise, which status would otherwise entitle Buyer to assert or allege the defense of sovereign immunity in any claim against it from:
(a)  Suit;
(b)  Jurisdiction of any court;
(c)  Relief by way of injunction, order for specific performance or for recovery of property;
(d)  Attachment of Buyer's assets (whether before or after judgment); and
(e)  Execution or enforcement of any judgment to which Buyer or Buyer's revenues or assets might otherwise be entitled in any proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any proceedings.

26.5. <u>Incorporation</u>:

These General Terms and Conditions shall be deemed to have been incorporated to any Sales Contract or Commitment entered into between the Seller and the Buyer since the effective date to the date in which these General Terms and Conditions have been withdrawn by the Seller or substituted by amended or new General Terms and Conditions as may be published in the Seller's Website (https://bunker.cepsa.com) from time to time.

26.6. <u>Entire agreement</u>:

The Contract is the sole and entire agreement of the parties to it with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject. In case of inconsistencies between these General Terms and Conditions and its Exhibits and the Special Terms the latter shall prevail.

26.7. <u>Severability</u>:

The validity of the provisions of a Commitment shall not be affected if any particular provision or provisions of a Commitment is or are declared illegal, unenforceable, or contrary to law or public policy. If as a result of a specified declaration any of the rights or obligations of a party are materially affected, then the parties shall meet and negotiate in good faith in order to arrive at an amendment of the provision(s) of a Commitment so affected, in such manner as will most closely and accurately reflect the intents and purposes of a Commitment.

26.8. <u>Partial Validity</u>:

If any provision of this Contract is or becomes or is held to be illegal, invalid or unenforceable in any respect under any law or jurisdiction, the provision shall be deemed to be amended to the extent necessary to avoid such illegality, invalidity or unenforceability, or, if such amendment is not possible, the provision shall be deemed to be deleted from this Contract to the extent of such illegality, invalidity or unenforceability, and the remaining provisions shall continue in full force and effect and shall not in any way be affected or impaired thereby

26.9. <u>Rights of third parties</u>:

Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

26.10. <u>Reach compliance</u>:

For deliveries where the loading terminal or the discharge port is located in the EEA, the Seller and the Buyer will comply with the provisions of Regulation (EC) no 1907/2006 ("reach") (as amended from time to time), which are applicable to the sale of products under the agreement.

To enable Buyer to meet its compliance obligations with regard to Regulation (EC) no 1907/2006 ("REACH") (as amended from time to time), Seller will provide Buyer with information regarding the chemical composition of any products (substances, preparations, mixtures, alloys or goods) supplied under this agreement, including the safety information required under reach and, where Seller is a EEA manufacturer, information regarding the registration or pre-registration status of any products pursuant to reach.

26.11. <u>Assignment and succession</u>:

Any Sales Contract or Commitment shall inure to the benefit of and be binding upon the parties and their respective successors and assigns. The Buyer shall not assign or encumber all or any part of the benefit of, or any rights or benefits under, any Contract or Commitment without the prior written consent of the Seller, which consent shall not be unnecessarily or unreasonably withheld or denied. Specifically, if the Buyer is acting as a part of a chain of contracts or as a company of a group of companies, the Buyer represents and warrants to the Seller that it has direct right to be paid by the Vessel's Owner in case of non-payment by any other parts of the chain of contracts or the group of companies.

The Buyer shall ensure and represents and warrants to the Seller that any receivables that any of the parties of the chain of contracts or group of companies shall not be assigned or encumbered in any form whatsoever if the Seller has not been timely paid in full.

The Seller may at any time assign all or any part of the benefit of, or its rights or benefits under, any Commitment.

The Seller may at any time sub-contract or enter into any arrangement whereby another person is to perform any or all of its obligations under any Commitment.

The Buyer shall not assign all or part of the supply ordered to a third party without the prior written consent of the Seller. Such consent shall not be unreasonably withheld by the Seller where the Buyer as assignee and the third party as assignor remain joint and severally liable for the due fulfilments of any and all contractual obligations.

### 26.12. Substitution:

In respect of any of the ports of delivery listed in the Port Services Guide, at any time the Seller may transfer its rights and obligations under a Commitment (without further notice to the Buyer) in respect of supplies of Marine Fuels to the Buyer to the Delivering Company identified for the relevant port of delivery. The Buyer agrees that upon such transfer it shall be bound to buy and take from the Delivering Company the whole or any part of the Marine Fuels that under such Commitment are to be sold and delivered to that port of delivery, upon these terms and conditions in all respects as if the Delivering Company was named as the Seller in such Commitment and the Seller shall stand discharged from all of its obligations under such Commitment to the Buyer in respect of the supply of Marine Fuel at that port of delivery.
Notwithstanding the foregoing provisions:

(a)  Notices to be given by or to the Seller or the Delivering Companies shall be given by or to the Seller (unless otherwise indicated); and
(b)  Unless the Buyer is requested to make payments directly to the Delivering Company, payments shall be made to the Seller for the benefit of the Delivering Company.

Notwithstanding the foregoing provisions of this section 26 the Seller shall stand and remain bound as guarantor to the Buyer of the performance by the Delivering Company of its obligations under any Commitment in respect of supplies of Marine Fuels.

### 26.13. Confidentiality:

*26.13.1.* Each party shall treat as confidential all information obtained as a result of entering into or performing any Commitment which relates to:
  (a)  the subject matter of these terms and conditions; or
  (b)  the other party.

*26.13.2.* Each party shall:

  (a)  Not disclose any such confidential information to any person other than any of its directors or employees who needs to know such information in order to discharge his/her duties;
  (b)  Not use any such confidential information other than for the purpose of satisfying its obligations under any Commitment; and
  (c)  Procure that any person to whom any such confidential information is disclosed by it complies with the restrictions contained in this section as if such person were a party to any Commitment.

*26.13.3.* Notwithstanding the other provisions of this section, either party may disclose any such confidential information:

(a)    if and to the extent required by law or for the purpose of any judicial proceedings;
(b)    to a Delivering Company;
(c)    to its affiliates, professional advisers, auditors and bankers;
(d)    if and to the extent the information has come into the public domain through no fault of that party; or
(e)    if and to the extent the other party has given prior written consent to the disclosure, such consent not to be unreasonably withheld.

Any information to be disclosed pursuant to sub-section 27.3(a) shall be disclosed only after notice to the other party.

*26.13.4.* The restrictions contained in this section shall continue to apply after the termination of any Commitment.

## 26.14. No partnership:

Nothing in a Commitment and no action taken by the parties under a Commitment shall constitute a partnership, association, joint venture or other co-operative entity between any of the parties.

## 26.15. Data and data protection:

*26.15.1.* Data supplied, whether personal or otherwise, by a Buyer and/or which relates to a Buyer's account, will, with the Buyer's consent, given with the acceptance of these GTC's, be held and processed by computer or otherwise by the Seller to operate the Buyer's account(s); to confirm, update and enhance the Seller's customer records; for statistical analysis; to establish any identity or otherwise as required under applicable legislation; to assess each Buyer's credit status on an on-going basis; and otherwise as considered necessary or appropriate by the Seller. In each case the processing may continue after the Commitment has ended.
Alternatively, the Buyer may be requested to complete or fulfil other checks as may be necessary to satisfy credit assessments, money laundering or fraud detection requirements.

*26.15.2.* The Seller may disclose, with the Buyer's consent, given with the acceptance of these GTC's, data relating to the Buyer and/or a Buyer's account(s) (a) to a credit reference agency where it may be accessed by other financial institutions to assist assessment of any application for credit made to the Seller and for debt tracing and fraud prevention; (b) to any agent or sub-contractor of the Seller performing services in connection with the Buyer's account; (c) to a Delivering Company or any other person to whom the Seller proposes to transfer any of its rights and/or duties under a Commitment; (d) to any guarantor or person providing security in relation to Buyer's obligations under a Commitment; (e) as required or permitted by law or any regulatory authority; and/or (f) as otherwise considered necessary or appropriate by the Seller.

*26.15.3.* Without prejudice to any other provisions for termination contained in these terms and conditions, all monies due and owing by the Buyer to the Seller shall become due and payable forthwith if the Seller discovers that any information provided by the Buyer to the Seller is materially inaccurate.

*26.15.4.* Pursuant to the European Regulation (UE) 2016/670 of 27th April 2016 and any other additional EU applicable Regulations and the Spanish Personal Data Protection Act (Basic law 15/1999 of 13 December) and Royal Decree 1720/2007 of 21 December, by which the enabling Regulations for the Personal Data Protection Act were approved and any other

regulations on data protection as may me applicable, the Seller undertakes strictly to comply with the provision of prevailing data protection legislation.

26.16. Compliance with law:

Notwithstanding anything contained in the Contract to the contrary, the obligations of the parties with respect to the consummation of the transactions contemplated by the said Contract shall be subject to all laws, present and future, of any government having jurisdiction over the parties and the Contract, and to orders, regulations, directions or requests of any such government.